IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| UNITED NATIONAL INSURANCE COMPANY, | ) ) | Civil No. 2:04-CV-00631 BSJ |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **MEMORANDUM OPINION & ORDER** |
| INTERNATIONAL PETROLEUM & EXPLORATION, and ST. PAUL SURPLUS LINES INSURANCE CO., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| INTERNATIONAL PETROLEUM & EXPLORATION, | ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| ZIONS INSURANCE AGENCY, INC., GRANT-HATCH & ASSOCIATES, INC., BUSINESS RISK SERVICES OF OHIO, INC., and WORLDWIDE FACILITIES, INC., | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

**FILED**
CLERK, U.S. DISTRICT COURT
December 20, 2007 (9:57am)
DISTRICT OF UTAH

* * * * * * * * *

## I.    INTRODUCTION

This matter is currently before the court on United National Insurance Company's

("UNIC") and International Petroleum & Exploration's ("IPE") cross-motions for summary

judgment.  UNIC and IPE dispute whether UNIC is obligated to indemnify IPE for the

approximately $1.4 million that IPE paid in relation to an industrial accident and the resulting

tort lawsuits.[1]

This matter is also before the court on UNIC's and St. Paul Surplus Lines Insurance Company's ("St. Paul") cross-motions for summary judgment.  UNIC and St. Paul dispute whether IPE is an additional insured of the umbrella policy that St. Paul issued to Noble Energy, Inc. ("Noble") and whether St. Paul was obligated by the commercial general liability policy issued to Noble to contribute $1 million or $2 million toward the settlement of the lawsuits that were brought after the accident.[2]

The court heard oral argument on these motions during a hearing on December 20, 2006.[3] During the hearing, Julianne Blanch and Richard Vazquez appeared on behalf of plaintiff and counterclaim-defendant UNIC; Terry Plant and Justin Hitt appeared on behalf of defendant St. Paul; and Reid Lambert and Tony Grover appeared on behalf of defendant, counterclaimant, and third-party plaintiff IPE.  Gary Johnson also appeared on behalf of third-party defendants Zions Insurance Agency, Inc. and Grant-Hatch & Associates, Inc., who opposed UNIC's motion for summary judgment against IPE.[4]

The court has carefully considered the parties' motions and related briefs, the arguments made by the parties during the December 20, 2006 hearing, and the relevant law and facts.  Now

---

[1](Plaintiff's Motion for Summary Judgment on All Claims Against, and on All Counterclaims of, Defendant International Petroleum & Exploration (dkt. no. 51); IPE's Cross-Motion for Summary Judgment (dkt. no. 78).)

[2](Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company (dkt. no. 82) ("UNIC's Motion for S.J. Against St. Paul"); Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 86).)

[3](Minute Entry, dated December 20, 2006 (dkt. no. 116); *see* Transcript of Hearing, dated December 20, 2006 (dkt. no. 122) ("Tr. 12/20/06").)

[4](Third-Party Defendants Zions Insurance Agency & Grant-Hatch's & Associates' [sic] Memorandum in Opposition to United National Insurance Company's Motion for Summary Judgment (dkt. no. 77).)

being fully advised, the court enters the following Memorandum Opinion & Order.

## II.    FACTUAL BACKGROUND[5]

IPE is an oil and gas exploration and production company that owns interests in several

producing oil and gas wells.[6]   At times relevant to this case, IPE, along with non-parties Aspect

---

[5]The following undisputed facts are set forth in the parties' briefs and the exhibits attached thereto. (UNIC's Memorandum in Support of Plaintiff's Motion for Summary Judgment on All Claims Against, and on All Counterclaims of, Defendant International Petroleum & Exploration (dkt. no. 52) ("UNIC's Memo. In Support"); IPE's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on All Claims Against, and on All Counterclaims of, Defendant International Petroleum & Exploration (dkt. no. 80) ("IPE's Opposition Memo."); UNIC's Combined Memoranda: 1) Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment on All Claims Against, and on All Counterclaims of, Defendant International Petroleum & Exploration[;] 2) Memorandum in Opposition to International Petroleum & Exploration's Motion for Summary Judgment (dkt. no. 97) ("UNIC's Reply"); Defendant International Petroleum's Reply Memorandum in Support of its Cross-Motion for Summary Judgment (dkt. no. 109) ("IPE's Reply"); UNIC's Memorandum in Support of Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company (dkt. no. 83) ("UNIC's Memo. In Support re: St. Paul"); Memorandum of Points and Authorities in Support of Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 87) ("St. Paul's Memo. In Support"); Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company (dkt. no. 95) ("St. Paul's Opposition Memo."); UNIC's Combined Memoranda: 1) Reply Memorandum in Support of Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company[;] 2) Memorandum in Opposition to Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 106) ("UNIC's Reply re: St. Paul"); Reply Memorandum in Support of Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 110) ("St. Paul's Reply").)

[6]While IPE, a Utah Corporation, is the defendant, counterclaimant and third-party plaintiff in this matter, it appears that UNIC and IPE both believe that International Petroleum, LLC, a Utah Limited Liability Company that is allegedly affiliated with IPE, is the proper party in interest in this matter.  (International Petroleum's Answer to Second Amended Complaint and Counterclaim (dkt. no. 70), at 2-3 ("International admits that International Petroleum & Exploration Corp. is a Utah Corporation doing business in Salt Lake County, Utah.  However, International believes that the proper party in interest in this lawsuit may be International Petroleum, LLC, a Utah Limited Liability Company which is affiliated with International Petroleum & Exploration Corp[.] and was also an insured under the relevant insurance policy.  To the extent that International Petroleum, LLC is the proper party in interest, the term "International" as used herein may be read to include International Petroleum, LLC.  Moreover, in answering the Second Amended Complaint, International has construed the term 'IPE' to include International Petroleum, LLC."); UNIC's Memo. In Support, at 3 n.1 ("'International Petroleum & Exploration' was originally named as the defendant in this matter, since it is named as the primary insured on the insurance policies at issue.  As discovery progressed, it appeared that a related company, International Petroleum, LLC, an additional insured under the same policies at issue, should be the real defendant in interest.  See Wixon Depo. at 10-11, at Exhibit D. Hereinafter, the terms 'International Petroleum & Exploration' and 'IPE' shall refer to International Petroleum, LLC. Following the Court's decision, Plaintiff will make a timely motion for pleadings to conform to the evidence in this regard.").)  In light of the parties' positions, as well as the fact that International Petroleum, LLC, and not IPE, was a party to the joint operating agreements that are relevant to the issues presently before the court, the court's reference throughout this opinion to "IPE" should be interpreted as meaning International Petroleum, LLC.  However, UNIC should file an appropriate motion to identify the real party in interest in this matter.

Energy, LLC ("Aspect") and Noble, owned interests in the "Arcola Project: Robert #1" (the

"Robert Well") and the "Arcola Project – C.J. Waller Trust #1" (the "C.J. Waller Well")

(collectively the "Wells").  Specifically, IPE owned a 10.4375% non-operating working interest

in the Wells; Aspect owned a 44.78125% non-operating working interest in the Wells; and

Noble owned the operator rights and a 44.78125% interest in the Wells.[7]

Two separate but similar operating agreements governed the ownership and operation of

the Wells.  Both operating agreements provided that "[t]he liability of the parties shall be

several, not joint or collective.  Each party shall be responsible only for its obligations, and shall

be liable only for its proportionate share of the costs of developing and operating the Contract

Area."[8]  Noble, as the operator of the Wells, was required to maintain commercial general

liability insurance with a combined single limit of $1 million for the benefit of the joint account.

The operating agreement related to the Robert Well specifically provided:

> The Operator, during the term of this Agreement, shall carry insurance for the
> benefit and at the expense of the parties hereto as follows unless notified in
> writing by Non-Operator(s):
> . . . .
> D.      _Commercial General Liability_ Insurance covering both Bodily Injury
>         and Property Damage with a Combined Single Limit of not less than
>         $1,000,000 each occurrence.
> . . . .
> The Operator shall charge the joint account for insurance premiums, losses
> (including applicable deductibles) not covered by such insurance shall be charged

---

[7]Originally, the agreement relating to the Robert Well was entered into between IPE and Aspect.  Under that agreement, IPE owned a 10.4375% non-operating working interest in the project and Aspect owned the operator rights and an 89.5625% interest in the project.  Later, Noble acquired the operator rights and half of Aspect's ownership interest in the Robert Well (44.78125%).

   The agreement relating to the C.J. Waller Well was originally entered into between non-operators IPE and Aspect and operator Samedan Oil Corporation ("Samedan").  Samedan later became Noble.

[8](St. Paul's Memo. In Support, Ex. 1 (Model Form Operating Agreement for Robert Well), at IP - 0068; _id._, Ex. 2 (Model Form Operating Agreement for C.J. Waller Well), at IP - 0014.)

to the joint account.[9]

The operating agreement related to the C.J. Waller Well similarly provided:

> 1.  At all times during the conduct of operations hereunder, Operator shall
> maintain in force the following minimum limits of Insurance, at the expense of,
> and for the benefit of the Joint Account:
> . . . .
>    c) Commercial General Liability insurance with a combined single limit of
>    $1,000,000 per occurrence.
> 2.  No other insurance shall be carried by Operator for the benefit of the Joint
> Account; however, the Operator and each Non-Operator shall provide and
> maintain in force at their own expense such other insurance or elect to be self
> insured as it deems necessary for protection against any claims, losses, damage
> or destruction arising out of operations of the joint property . . . .[10]

On January 13, 2003, non-party T & L Environmental Services, Inc. ("T & L"), which was hired by Noble to dispose of waste material collected in the Wells, was unloading waste that had been transported from one or both of the Wells at a waste disposal facility.  During the unloading of the waste, a serious explosion and resulting fire occurred (the "Accident"). Francisco Perez Juarez, Macarto Martinez Juarez and Ray Barry Rayburn died as a result of the Accident.  In addition, Tracy Riggle, Omero Martin, Jose Octavio Diaz and Jose Manuel suffered serious injury.  None of these individuals were employees of Noble, Aspect or IPE.

After the Accident, two lawsuits for wrongful death and personal injury were filed against Noble and others in Texas state court.  As to Noble, the complaints generally alleged that it failed to provide sufficient warning that the storage tanks holding the waste from the Wells contained flammable material.  IPE was not named as a defendant in either of the lawsuits.

At the time of the Accident, Noble was a named insured of two insurance policies issued

---

[9](*Id.*, Ex. 1 (Model Form Operating Agreement for Robert Well), at IP - 0094 (Exhibit "D" – Insurance Exhibit).)

[10](*Id.*, Ex. 2 (Model Form Operating Agreement for C.J. Waller Well), at IP - 0044 (Exhibit "D").)

by St. Paul: a commercial general liability insurance policy (Policy No. MU05532557) (the "St. Paul CGL Policy"), and a commercial umbrella liability policy (Policy No. MU05571646) (the "St. Paul Umbrella Policy") (collectively the "St. Paul Policies").  Noble ultimately settled the lawsuits for approximately $10.8 million.  Pursuant to the St. Paul CGL Policy, St. Paul contributed $1 million toward the settlement for the benefit of the joint account.  Aspect's insurer paid Aspect's share of the remainder of the settlement, and Noble's share was covered by the St. Paul Umbrella Policy.  Noble invoiced IPE for IPE's proportionate share of the settlement, which given its 10.4375% non-operating working interest in the Wells amounted to $1,422,375.

At the time of the Accident, as well as at the time of Noble's demand, IPE was an insured of two UNIC insurance policies: a commercial general liability policy (Policy No. BRS0001212) (the "UNIC CGL Policy"), and an excess third-party liability policy (Policy No. XTA0003725) (the "UNIC Excess Policy") (collectively the "UNIC Policies").  The UNIC CGL Policy refers to IPE's non-operating working interests in oil and gas wells and indicates that a premium would be charged for coverage of such interests.[11]  After Noble's demand for IPE's proportionate share of the costs of the lawsuits, IPE sought coverage from UNIC.  UNIC denied IPE's claim.  Thereafter, IPE paid the approximately $1.4 million out of pocket.

UNIC then filed this lawsuit against IPE and St. Paul.  UNIC seeks a declaration from the court that it has no duty under the UNIC Policies to indemnify IPE.  UNIC also seeks a declaration that IPE was an additional insured of the St. Paul Policies issued to Noble and that UNIC has no duty to indemnify IPE because such policies provide the primary and only

---

[11]IPE argued during oral argument that it had paid a separate premium for its non-operating working interests.  (Tr. 12/20/06, at 39:9-22 (Mr. Lambert).)   UNIC did not dispute that IPE had paid such a premium.

necessary layers of coverage for IPE's claim.

IPE filed a counterclaim against UNIC, asserting a claim for breach of contract and seeking a declaration that any loss suffered by IPE as a result of the Accident is covered by the UNIC Policies.[12]

## III.   ANALYSIS

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[13]  UNIC, IPE, and St. Paul each have moved for summary judgment, claiming that the material facts are not in dispute and that they are entitled to judgment as a matter of law.  The court agrees that as to the claims currently before the court, there is no genuine issue as to any material fact and that summary judgment is appropriate.

According to UNIC, its claims against St. Paul are relevant only "[s]hould the Court deny [UNIC's] pending motion for summary judgment against [IPE]."[14]  Because the manner in which

---

[12]In its counterclaim, IPE also asserts a claim alleging that in the event that the court determines that the UNIC Policies do not provide liability protection for IPE's non-operated wells, the omission of such coverage constituted a mutual mistake and the UNIC Policies should be reformed to include coverage for IPE's claims arising from the Accident.  The merits of this counterclaim are not currently before the court.

IPE also filed a third-party complaint against third-party defendants Zions Insurance Agency, Inc., Grant-Hatch & Associates, Inc., Business Risk Services of Ohio, Inc., and Worldwide Facilities, Inc.  IPE's claims against the third-party defendants "are asserted only to the extent that [UNIC] prevails on its claim for relief against [IPE]." (Third-Party Complaint (dkt. no. 6).)

[13]Fed. R. Civ. P. 56(c).

[14](*See* UNIC's Motion for S.J. Against St. Paul, at 1-2 ("Should the Court deny plaintiff's pending motion for summary judgment against International Petroleum & Exploration, and find that coverage exists under the substantively similar coverage language of the policies issued by St. Paul Surplus Lines Insurance Company and United National Insurance Company, the plain language of the subject policies issued by St. Paul Surplus Lines Insurance Company and United National Insurance Company, establish that the St. Paul policies provide the primary, and only necessary layers of insurance coverage for the damages sought by defendant and counterclaimant

(continued...)

the dispute between UNIC and IPE is resolved could have a potentially dispositive effect on the cross-motions for summary judgment between UNIC and St. Paul, the court will address UNIC's and IPE's cross-motions for summary judgment before turning to UNIC's and St. Paul's cross-motions for summary judgment.

### A.     UNIC's and IPE's Cross-Motions for Summary Judgment

UNIC and IPE dispute whether UNIC has a duty to indemnify IPE for the approximately $1.4 million that IPE paid to Noble after the lawsuits related to the Accident were settled. UNIC's duty to indemnify IPE is a contractual duty that is governed by the terms of the UNIC Policies.[15]  Under Utah law, which UNIC and IPE agree governs the interpretation of the UNIC Policies,

> "[a]n insurance policy is merely a contract between the insured and the insurer."
> *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993).  As a result,
> we interpret insurance policies as we do contracts: "if the language within the four
> corners of the contract is unambiguous, the parties' intentions are determined
> from the plain meaning of the contractual language."  *Saleh v. Farmers Ins.
> Exch.*, 2006 UT 20, P21, 133 P.3d 428 (internal quotation marks omitted).[16]

"Whether an ambiguity exists in a contract is a question of law."[17]  A contract may be ambiguous if it is unclear or omits terms, or where the terms used "'to express the intention of the parties may be understood to have two or more plausible meanings.'"[18]  Policy terms, however, "are not

---

[14](...continued)
International Petroleum & Exploration.").)

[15]*See Fire Ins. Exch. v. Therkelsen*, 27 P.3d 555, 559 (Utah 2001) ("The duty to indemnify is a contractual one, and, accordingly, the issue at hand is governed by the terms of the parties' contract . . . .").

[16]*Benjamin v. Amica Mutual Ins. Co.*, 140 P.3d 1210, 1213 (Utah 2006).

[17]*Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993).

[18]*Id.* (quoting *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 583 (Utah Ct. App.
(continued...)

necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests."[19]  "If a policy is ambiguous, doubt is resolved against the insurer.  However, if a policy is not ambiguous, no presumption in favor of the insured arises and the policy language is construed according to its usual and ordinary meaning."[20]

### 1.   The Insuring Clause of the UNIC CGL Policy

As it relates to the duty to indemnify, the "Insuring Agreement" section of the UNIC CGL Policy provides that UNIC "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."[21]  UNIC and IPE disagree as to whether IPE was "legally obligated" to pay the $1.4 million and whether IPE's obligation to pay such amount arose "because of 'bodily injury,'" as required by the insuring language of the Policy.

According to UNIC, the phrase "legally obligated to pay as damages because of 'bodily injury'" confines coverage to liability arising from an insured's tortious conduct and does not extend coverage to an insured's contractual liability.[22]  UNIC argues that IPE's obligation to pay

---

[18](...continued)
1990)).

[19]*Alf*, 850 P.2d at 1274-75.

[20]*Id.* at 1274 (citations omitted).

[21](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00301.)

[22](*See* UNIC's Memo. In Support, at 12 ("When an insured's own negligence causes injury or death, that insured has caused damages *because of* 'bodily injury . . . .'"  That type of tort liability obviously arises  *because of* bodily injury having occurred." (emphasis in original)); UNIC Reply, at 3 ("Since IPE, as a nonoperator, cannot be held liable in tort for the Rosharon accident under Texas law, liability is not triggered under the insuring clause."); Tr. 12/20/06, at 11:10-14 (arguing that the "legal obligation to pay" element in the insuring provision "encompasses the notion that the insured has to do something negligent, something careless, something of his own volition where

(continued...)

damages in connection to the Accident arose because of its contractual obligation under the operating agreements, not because of bodily injury.  UNIC contends that because IPE is seeking coverage for amounts owed under a contract, and because no tort claim was pursued against IPE, IPE's claim is not covered by the UNIC CGL Policy.[23]

 IPE disagrees.  According to IPE, the insuring language of the UNIC CGL Policy merely requires that the insured be legally obligated pay damages and that such damages arise because of bodily injury.  IPE argues that its damages – its proportionate share of the costs of the lawsuits – are "damages because of 'bodily injury'" because they arose as a result of people being killed and injured in the Accident, not because the operating agreements created them.  With respect to the Policy's requirement that the insured be "legally obligated to pay" such damages, IPE argues that the Policy does not define what the source of the insured's legal obligation to pay must be, limit coverage to an insured's legal obligation to pay damages because of tort liability, or require that the insured be involved in a lawsuit in order to meet the "legally obligated" requirement of the insuring provision.

---

[22](...continued)
somebody was hurt" and that "we don't have that here") (Ms. Blanch).)  According to UNIC, "there is simply no reading of the applicable policies that can extend coverage to any claim based in contract."  (UNIC's Memo. In Support, at 3.)

 [23]UNIC argues:

  It is undisputed that IPE has never been accused of causing the Rosharon explosion.  IPE has never been sued in connection with the Rosharon explosion.  Moreover, under Texas law, which governs tort claims arising from the explosion, IPE *cannot* be held liable in tort by a third party for acts of its operator under a joint operating agreement.  IPE cannot ever become "legally obligated" to pay damages for the bodily injury in the underlying litigation.  Therefore, the amount Noble seeks from IPE is not a sum that IPE is "legally obligated to pay" as damages because of bodily injury.

UNIC's Memo. In Support, at 13 (emphasis in original) (footnote omitted).  According to UNIC, "[t]he fact that the Rosharon explosion caused 'bodily injury' is of no consequence.  The explosion simply functioned as a portion of those contractual operating expenses IPE agreed to contribute under the operating agreements."  ( *Id.* at 16.)

Neither UNIC nor IPE claim that the phrase "legally obligated to pay as damages because of 'bodily injury'" is ambiguous, and the court determines that such language is unambiguous. The court will therefore construe such language according to the plain meaning of the contractual language.

"Bodily injury" is defined by the Policy as meaning: "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."[24]  The Policy also specifies that "[d]amages because of 'bodily injury' include damages claimed by any person or organization for . . . death resulting at any time from the 'bodily injury.'"[25]

UNIC argues that the insuring language of the Policy does not cover IPE's claim because IPE did not "cause[] some bodily injury."[26]  However, the insuring clause does not limit indemnification coverage to bodily injury damages *caused* by IPE.  Instead, the Policy simply provides that it will pay those damages that IPE becomes legally obligated to pay "*because of* 'bodily injury.'"

It is undisputed that the Accident caused "bodily injury," including bodily injury that resulted in death.  It is also undisputed that IPE would not have been obligated to pay the approximately $1.4 million – the amount it seeks from UNIC – had it not been for the Accident and the resulting bodily injury and death.  Thus, the court determines that as a result of the Accident, IPE paid over $1.4 million in "damages because of 'bodily injury,'" as those terms are used in the UNIC CGL Policy.

---

[24](*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00310.)

[25](*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00301.)

[26](Tr. 12/20/06), at 13:12-14 (Ms. Blanch); *see id.* at 12:21-22 ("IPE is only here because of a contractual obligation to Noble.  It is not here because it injured anyone.") (Ms. Blanch).)

11

Next, the court must determine whether IPE was "legally obligated" to pay such damages, as that term is used in the insuring clause of the Policy. UNIC and IPE agree that IPE was contractually obligated by the operating agreements to contribute its proportionate share of the costs of the lawsuits. UNIC does not argue that IPE's obligation under the operating agreements was not a legal obligation; instead UNIC argues that this is not the *type* of legal obligation covered by the Policy. The court disagrees.

UNIC has failed to identify any provision in the Policy that supports its position that the insuring language limits the Policy's coverage to claims based on an insured's primary tort liability. Instead, in contrast to UNIC's position, the Policy itself expressly recognizes that certain contractual liability is covered. The Policy's "Contractual Liability" exclusion provides that coverage does not apply to contractually assumed liability for bodily injury or property damage unless the insured's agreement with a third-party is an "'insured contract.'" [27] The Policy then goes on to provide an extensive definition of the term "insured contract."[28]

The existence of the contractual liability exclusion persuades the court that the "legally obligated" requirement of the insuring provision should not be interpreted as limiting coverage to primary tort liability. Interpreting the "legally obligated" requirement of the Policy as meaning that all contractual liability is excluded would render the Policy's contractual liability exclusion meaningless. Such an interpretation would be contrary to the court's obligation to construe the Policy so as to harmonize and give effect to all of its provisions.[29]

---

[27](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00301.)

[28](*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00311.)

[29]*See Dixon v. Pro Image, Inc.*, 987 P.2d 48, 52 (Utah 1999) ("[A] court must attempt to construe the

(continued...)

UNIC has also failed to identify any Utah case interpreting the phrase "legally obligated" in a commercial general liability policy as limiting coverage to an insured's primary tort liability, and the court is not aware of any such case.[30]

On the other hand, *Gibbs M. Smith, Inc. v. United States Fidelity & Guaranty Co.*, 949 P.2d 337 (Utah 1997), which involved a commercial general liability policy with insuring language nearly identical to the insuring language of the UNIC CGL Policy, instructs the court that the UNIC CGL Policy's insuring language should be interpreted as providing coverage for IPE's claim.  Gibbs M. Smith, Inc. ("Gibbs"), a publisher, was an insured of a commercial general liability policy issued by United States Fidelity and Guaranty Co. and Fidelity and Guaranty Underwriters, Inc. (collectively "USF&G").[31]  Gibbs entered into a publication contract with Tom Heinz, an author who planned to illustrate his book with reproductions of original photographs.[32]  Under its contract with Heinz, Gibbs agreed to be responsible for any loss or damage caused to Heinz's photographs and agreed that each photograph was worth

---

[29](...continued)
contract so as to 'harmonize and give effect to all of [its] provisions.'" (quoting *Nielsen v. O'Reilly*, 848 P.2d 664, 665 (Utah 1993))).

[30]UNIC relies heavily on *Nova Cas. Co. v. Able Constr., Inc.*, 983 P.2d 575 (Utah 1999), and *Scottsdale Ins. Co. v. Great American Assurance Co.*, 610 S.E.2d 558 (Ga. Ct. App. 2005), in support of its position that IPE's "contractually based" claim is not entitled to coverage under the insuring clause of the UNIC CGL Policy.  ( *See* UNIC's Reply, at 5.)  After carefully considering *Nova* and *Scottsdale*, the court determines that UNIC has overreached in its characterization of those cases.  Neither of those cases are factually similar to this case.  Moreover, neither *Nova* nor *Scottsdale* contain any analysis that persuades the court that the language used in the insuring clause of the UNIC CGL Policy precludes coverage for contractual liability or limits coverage to an insured's tort liability.

[31]*Gibbs M. Smith*, 949 P.2d, at 339.

[32]*Id.* at 339-40.

13

$1,500.[33]  During the printing of Heinz's book, which was done by a subcontractor of Gibbs who had "out-sourced the color separation of the photographs," Heinz's photographs were lost.[34] After the loss, Heinz demanded $27,000 from Gibbs, which pursuant to the parties' contract represented $1,500 for each of the nineteen lost photographs.[35]  Gibbs, in turn, sought coverage from USF&G for the amount Heinz demanded.[36]  The USF&G policy, like the UNIC CGL Policy, provided that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."[37]  When USF&G refused coverage, Gibbs filed a lawsuit against USF&G seeking coverage.[38]

After analyzing the contract and hazard exclusions of the USF&G policy, as well as the policy's definition of "coverage territory," the Utah Supreme Court determined that the USF&G policy covered Gibbs' claim.[39]  Implicit in the court's decision was the determination that Gibbs' contractual obligation to Heinz was a legal obligation that was covered by the insuring language of the USF&G policy.

Common to both *Gibbs M. Smith* and this case are: (1) a contract between an insured and a third-party; (2) a demand from the third-party that, pursuant to the parties' contract, the insured

---

[33]*Id.* at 340.

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]*Id.* at 346.

14

pay certain damages; and (3) the insured's claim for coverage under a policy with insuring language providing that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  While the insured in *Gibbs M. Smith* was obligated to pay damages because of property damage, in contrast to IPE's obligation to pay damages because of bodily injury, the Utah Supreme Court's decision in *Gibbs M. Smith* indicates that under Utah law, insuring language that limits coverage to damages the insured is "legally obligated to pay" does not limit coverage to an insured's tort liability.

In addition, both the UNIC CGL Policy and *Gibbs M. Smith* indicate that a lawsuit against IPE is not necessary in order to invoke UNIC's duty to indemnify.  First, although the insuring language of the UNIC CGL Policy specifies that UNIC's duty to defend is invoked where there is a "'suit,'" there is nothing in the Policy that indicates that a lawsuit is required before UNIC will have a duty to indemnify.  If UNIC intended that its duty to indemnify would be dependent upon a lawsuit being filed against its insured, it should have clearly drafted such a limitation in the Policy.  It did not do so.

Moreover, in *Gibbs M. Smith*, the Utah Supreme Court determined that the USF&G policy covered Gibbs' obligation to Heinz even though Gibbs was not actually sued by Heinz, but instead was merely demanded to pay the $27,000.  This indicates that the "legally obligated" language in the UNIC CGL Policy's insuring clause should not be interpreted to mean that UNIC has no duty to indemnify unless a lawsuit is filed against its insured, as UNIC suggests. Thus, the court does not agree with UNIC that the fact that IPE has not been sued in connection with the Accident means that IPE cannot be "legally obligated" to pay damages for the bodily

injury caused by the Accident.

For the above reasons, the court determines that IPE's indemnification claim is covered by the insuring language of the UNIC CGL Policy.

## 2.      UNIC CGL Policy Exclusions

UNIC also argues that four exclusions of the UNIC CGL Policy – the contractual liability, pollution, liability arising from others, and damages claimed by a co-owner exclusions – bar IPE's claim.  IPE, on the other hand, argues that none of these exclusions preclude UNIC's coverage of its claim.

Where, as in this case, an insured's claim is covered by an insurance policy's insuring language, the question of whether any exclusions apply to preclude coverage becomes relevant. "An insurer may exclude from coverage certain losses by using language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided."[40]

As discussed in detail below, the court determines that none of the exclusions cited by UNIC preclude coverage of IPE's indemnification claim.

## a.      Contractual Liability Exclusion

The "Contractual Liability" exclusion provides that coverage under the UNIC CGL Policy does not apply to "'[b]odily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."[41] The Policy then describes certain exceptions to the exclusion, as follows:

---

[40]*Alf*, 850 P.2d at 1274 (quotations and citations omitted).

[41](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00301.)

This exclusion does not apply to liability for damages:
(1) That the insured would have in the absence of the contract or agreement; or
(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.[42]

The Policy defines the term "insured contract" as meaning, among other things:

That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.[43]

In claiming that the UNIC CGL Policy's contractual liability exclusion applies, UNIC argues that the $1.4 million paid by IPE represents damages that IPE was obligated to pay by reason of the assumption of liability in a contract. UNIC claims that IPE contractually assumed liability by entering into the operating agreements and agreeing to share in the operation costs of the Wells, including costs arising from Noble's tort liability. According to UNIC, this type of agreement is excluded from coverage.

However, in order to prevent the "insured contract" exception from applying to IPE's claim, UNIC repeatedly argues that IPE did not agree to indemnify Noble or to assume the tort liability of Noble:

IPE did not assume the tort liability of Noble in the operating agreements. There is nothing in the language of the operating agreements that indicated IPE agreed either to pay tort judgments rendered against Noble, or to hold Noble harmless from any tort liability. It is simply a cost-splitting agreement applicable to *all* claims and lawsuits, without mentioning indemnity for tort

---

[42] (*Id.*)

[43] (*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00311.)

17

liability.[44]

The dilemma for UNIC is posed by the Utah Supreme Court's holding in *Gibbs M. Smith*. In that case, the court analyzed a contract exclusion clause with language nearly identical to that used in the UNIC CGL Policy.[45]  In interpreting the exclusion, the court indicated that language in a contract exclusion clause regarding an insured's assumption of liability in contract "'refers to a particular type of contract – a hold harmless or indemnification agreement – and not to the liability that results from breach of contract . . . .'"[46]  The court then indicated that "[t]he pertinent law abundantly confirms that a liability insurance contract exclusion clause excludes

---

[44](UNIC's Memo. In Support, at 22-23; *see id.* at 7 ("The operating agreements contain no indemnification language.  The agreements contain no language suggesting that IPE and Noble are parties to a joint venture, or that either IPE or Noble are jointly and severally liable for damages resulting from lawsuits brought by third parties."); Tr. 12/20/06, at 14:9-17 ("And, Your Honor, it's important to put IPE's contractual obligation under the Joint Operating Agreement in context and in its proper context.  It's not an indemnification agreement.  IPE does not agree to relieve Noble from all liability.  And it does not agree to relieve Noble of any tort liabilities.  Instead, it's a cost sharing agreement, and IPE does not assume Noble's tort liabilities.  However, IPE does agree to share in the cost of any tort-based settlement or verdict that Noble enters into and it agrees to do this by contract.") (Ms. Blanch); Tr. 12/20/06, at 16:19-25 (arguing that the operating agreements were not "indemnification" agreements and that IPE "did not assume any tort liabilities in the Joint Operating Agreements.  It did not consent to be sued by the people who were injured in the underlying agreement [sic].  And it did not agree to pay Noble's entire settlement, instead it was paying under a [cost sharing] agreement.") (Ms. Blanch).)

[45]Like the contractual liability exclusion in the UNIC CGL Policy, the contract exclusion clause at issue in *Gibbs M. Smith* provided:

    2.  Exclusions.
    This insurance does not apply to:
      a. . . . ;
      b.  "Bodily injury" or "property damage" for which the insured is obligated to pay damages
      by reason of the assumption of liability in a contract or agreement.  This exclusion does not
      apply to liability for damages:
        (1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily
        injury" or "property damage" occurs subsequent to the execution of the contract or
        agreement; or
        (2) That the insured would have in the absence of the contract or agreement.

949 P.2d at 340-41.

[46]*Id.* at 341 (quoting *Olympic, Inc. v. Providence Wash. Ins. Co.*, 648 P.2d 1008, 1011 (Alaska 1982)).

only contracts in which the insured assumes the tort liability of another."[47]

In attempting to avoid the application of the "insured contract" exception to the exclusion by arguing that IPE did not agree to assume Noble's tort liability, indemnify Noble, or hold Noble harmless, UNIC implicitly acknowledges that the exclusion itself does not apply to IPE's claim under *Gibbs M. Smith*.

While UNIC seems to acknowledge that the UNIC CGL Policy's contractual liability exclusion does not apply to IPE's claim under *Gibbs M. Smith*, it claims that the court should not rely on that case. UNIC claims that considering the Policy's definition of "insured contract," which includes contracts in which the insured "assume[s] the tort liability of another party to pay for 'bodily injury,'" "the reasoning of the *Gibbs M. Smith* court leads to an absurd result – that the exclusion will only apply to contracts in which tort liability is expressly assumed, yet the 'insured contract' exception promptly renders the exclusion useless for those very types of contracts."[48] UNIC argues that the Utah Supreme Court should have considered the "insured contract" exception and that had it done so, it "might have reached a different result."[49]

UNIC has not persuaded the court that *Gibbs M. Smith* should not be applied in this case. First, UNIC has not made any argument that the Utah Supreme Court erred by not considering the "insured contract" exception to the contractual liability exclusion at issue in that case. Under Utah law, a court must first determine whether an insured's claim is covered by the insuring

---

[47]*Id.* at 341; *see id.* (indicating that USF&G correctly argued that "'Courts have over and over again interpreted the phrase "liability assumed by the insured under any contract" to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to 'assume' the tort liability of another'").

[48](UNIC's Memo. In Support, at 21.)

[49](*Id.* at 21-22.)

clauses of the applicable policy before analyzing whether any exclusions apply.[50]  If the insuring

language does not apply, then "the exclusions are not relevant."[51]  Similarly, where an exclusion

does not apply, the exceptions to such exclusion are not relevant and need not be considered.[52]

Second, the *Gibbs M. Smith* decision is silent as to how the policy at issue in that case defined

"insured contract."  UNIC has not presented the court with any reason to assume that the

definition of "insured contract" in the policy in *Gibbs M. Smith* was the same definition included

in the UNIC CGL Policy.  The court, therefore, is not in a position to analyze whether the Utah

Supreme Court's decision was "logically flawed," as UNIC suggests, or to determine whether

the Utah Supreme Court's decision would have been different had it analyzed the "insured

contract" exception to the exclusion.  Where both UNIC and IPE have asked the court to apply

Utah law, where *Gibbs M. Smith* interprets exclusionary language that is substantively the same

as the exclusionary language that UNIC relies on to preclude coverage of IPE's claim, and where

there is no indication that *Gibbs M. Smith* has been overruled or that the Utah Supreme Court

would now make a different determination, the court concludes that *Gibbs M. Smith* should be

applied to this case.

In entering into the operating agreements, IPE either agreed, or did not agree, to assume

the tort liability of Noble.  Either way, the contractual liability exclusion does not apply to IPE's

---

[50]*Vestin Mortg., Inc. v. First Am. Title Ins. Co.*, 101 P.3d 398, 401 (Utah Ct. App. 2004) ("Vestin's argument that the policies are ambiguous is based upon its reading of the exclusions to the policies; however, before we can review the exclusions, we must first determine whether Vestin's claims are covered by the insuring clauses of the policies.  If Vestin's claims are not covered by the policies, then the exclusions are not relevant." (footnotes omitted)); *Vestin Mortg., Inc. v. First Am. Title Ins. Co.*, 139 P.3d 1055, 1057 (Utah 2006).

[51]*Vestin Mortg.*, 101 P.3d at 401.

[52]*Gibbs M. Smith*, 949 P.2d at 342 ("Therefore, the contract exclusion clause b. does not apply to Gibbs' liability to Heinz, and *we need not consider* the 'insured contract' exception." (emphasis added)).

claim.  On the one hand, if IPE did not agree to assume the tort liability of Noble, then the

contractual liability exclusion does not apply to IPE's claim under *Gibbs M. Smith*.  On the other

hand, if IPE did agree to assume Noble's tort liability, then the "insured contract" exception to

the exclusion applies, preventing the application of the exclusion to IPE's claim.  To the extent

that the UNIC CGL Policy's definition of "insured contract" does not make sense in light of

*Gibbs M. Smith*, that problem falls on the shoulders of UNIC, the drafter of the Policy.  Any

ambiguity is to be resolved in favor of IPE, the insured.[53]

### b.   Pollution Exclusion

UNIC also argues that the UNIC CGL Policy does not cover IPE's claim because of the

Policy's "Pollution" exclusion.  Specifically, UNIC claims that the following language bars

IPE's claim:

> 2.   Exclusions
> This insurance does not apply to:
> . . . .
>    f.  Pollution
>       (1) "Bodily injury" or "property damage" arising out of the actual,
>       alleged or threatened discharge, dispersal, seepage, migration, release
>       or escape of "pollutants":
> . . . .
>          (b) At or from any premises, site or location which is or was at any
>          time used by or for any insured or others for the handling, storage,
>          disposal, processing or treatment of waste; . . . .[54]

"Pollutants" are defined in the Policy as meaning "any solid, liquid, gaseous or thermal irritant

or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste

---

[53]*See Alf*, 850 P.2d at 1274.

[54](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00302.)

includes materials to be recycled, reconditioned or reclaimed."[55]

According to UNIC, the explosion that caused the Accident occurred when a "hydrocarbon vapor cloud" was released "during the unloading of hazardous waste from two vacuum trucks, into an open area collection pit at the BLSR waste disposal facility."[56]  IPE does not dispute the existence of a "hydrocarbon vapor cloud," but also describes the Accident as occurring when "fumes" were ignited by the running engines of the disposal trucks.[57]

In the court's view, the factual record presented by the parties regarding what actually caused the Accident is cursory at best.[58]  For instance, neither party provides specific evidence

_____

[55](Id., Ex. A1 (UNIC CGL Policy), at UNG-00312.)

[56](Id. at 19.)

[57](IPE's Opposition Memo., at 10 ¶ 1.)

[58]In support of its claim that a "hydrocarbon vapor cloud" contributed to the explosion, UNIC relies on an Investigation Report issued by the U.S. Chemical Safety and Hazard Investigation Board ("CSB").  (UNIC's Memo. In Support, at 5, 19, Ex. D (Investigation Report).)  CSB

> is an independent Federal agency whose mission is to ensure the safety of workers, the public, and the environment by investigating and preventing chemical incidents.  CSB is a scientific investigative organization; it is not an enforcement or regulatory body.  Established by the Clean Air Act Amendments of 1990, CSB is responsible for determining the root and contributing causes of accidents, issuing safety recommendations, studying chemical safety issues, and evaluating the effectiveness of other government agencies involved in chemical safety.

(Id., Ex. D (Investigation Report), at 3.)  However, although neither UNIC nor IPE have raised this point, the CSB report specifically provides that "[n]o part of the conclusions, findings, or recommendations of CSB relating to any chemical incident may be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in an investigation report (see 42 U.S.C. § 7412 [r][6][G])."  (Id., Ex. D (Investigation Report), at 3.)  See 42 U.S.C. § 7412(r)(6)(G) ("No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.").  UNIC also relies on the deposition testimony of William Poillon, a former Senior Vice President of Drilling and Production for Noble.  That testimony, however, indicates that to his knowledge, there was never any conclusive evidence as to what the source of the material was that exploded.  (Id., Ex. F (Poillon Deposition, dated January 25, 2006), at 33-36.)  Both parties rely on the portion of the deposition of Mark Wixom, Vice President of IPE, relating to a certain news release describing the Accident.  During the deposition, the news release was described by counsel for UNIC as follows:

> If you could look at the third paragraph where it starts out, the January 13th accident in Rosharon, Texas.  Then it says it occurred as two tank trucks unloaded waste liquid into an open collection

(continued...)

regarding the source of the "hydrocarbon vapor cloud" or "fumes" and it is unclear whether waste from one or both of the Wells, other matter contained in the disposal trucks, other matter contained in the collection pit at the disposal site, or a combination of material from more than one of these sources was the source of the "vapor" or "fumes" that played a role in causing the Accident.  Similarly, neither party provides any evidence regarding the specific composition of the "hydrocarbon vapor cloud" or "fumes."  However, in light of the parties' apparent agreement that the ignition of "vapor" or "fumes" at the disposal site caused the Accident, the court will determine whether based on those facts, the pollution exclusion applies to IPE's claim.

UNIC argues that because "the explosion was caused by the 'release' of 'vapor' 'at' a 'site or location' that was used by 'others' for the 'disposal' of 'waste[,]' . . . the plain language of the exclusion (which governs under Utah law) clearly applies to IPE's claim loss."[59]

IPE, on the other hand, argues that the meaning of the pollution exclusion is not as "plain" as UNIC suggests.  According to IPE, a reasonable interpretation of the pollution exclusion is that it only applies to bodily injury caused by traditional environmental pollution. IPE claims that because the bodily injury suffered as a result of the Accident was caused by an explosion and fire, and not by a pollutant acting as a pollutant, the pollution exclusion does not

---

[58](...continued)
pit at the BLSR Operating Limited disposal facility.  Unknown to either the drivers or the BLSR personnel, the waste material was highly volatile, and a flammable vapor cloud formed in the unloading area.  Vapor was drawn into the air intakes of the trucks' running diesel engines, causing them to race and backfire, and the flammable cloud ignited.

(*Id.*, Ex. C (Wixom Deposition, dated January 23, 2006), at 54.) Mr. Wixom testified that the description in the news release was his understanding of how the Accident happened.  (*Id.*)  Mr. Wixom then testified that IPE did not do an independent investigation into how the Accident occurred.  (*Id.*)  This is the extent of the factual record presented by the parties regarding the cause of the Accident.

[59](UNIC's Reply, at 7.)

apply to its claim.

When the definition of the term "pollutant" is inserted into the body of the pollution exclusion, the exclusion precludes coverage for:

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of [any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.]

This language is susceptible of more than one interpretation.

On the one hand, the language of the exclusion can be interpreted literally, as UNIC suggests. A purely literal interpretation of the exclusionary language would result in an extensive and broad application of the exclusion. Under a literal reading, the exclusion could apply to preclude coverage for accidents occurring during normal business activities where such accidents involve, for example, the "release" or "escape" of "smoke," "vapor," "fumes," "chemicals," or "waste." Under such an interpretation, the exclusion could even be applied in situations involving "everyday elements [such] as water or air."[60]

On the other hand, the pollution exclusion can reasonably be interpreted as only applying to those hazards traditionally associated with environmental pollution, as IPE argues. There is nothing inherently bad about the things enumerated as "pollutants," such as "smoke," "vapor," "soot," "fumes," "acids," "chemicals," and "waste," including "materials to be recycled." These things often play a role in normal and ordinary business activities. However, when these things are viewed in the context of an exclusion entitled "Pollution," wherein such things are defined as "pollutants" and are described in relation to words such as "discharge," "dispersal," "seepage,"

---

[60]*See American States Ins. Co. v. Koloms*, 687 N.E.2d 72, 77-78 (Ill. 1997).

24

"release," and "escape," these things become "terms of art that bespeak of environmental contamination."[61]  Thus, a reasonable interpretation of the pollution exclusion relied on by UNIC is that it excludes coverage only where bodily injury is caused by a pollutant acting as a pollutant, or in other words, by traditional environmental pollution.

Given these two possible interpretations, the court determines that the exclusion "'may be understood to have two or more plausible meanings[,]'" and is therefore ambiguous.[62]  Under UNIC's literal construction of the pollution exclusion, the exclusion would apply to potentially limitless circumstances and would, accordingly, severely limit IPE's coverage under the Policy. Because the language of the exclusion did not "clearly and unmistakably communicate[]"[63] this loss of coverage to IPE and because "any ambiguity or uncertainty in the language of an insurance policy must be resolved in favor of coverage,"[64] the court determines that IPE's reading of the language is correct, and the Policy's the pollution exclusion does not bar IPE's claim.

### c.      Liability Arising from Others Exclusion

UNIC also argues that the "Exclusion – Liability Arising From Others" endorsement to the UNIC CGL Policy precludes coverage of IPE's claim.  That endorsement provides:

---

[61]*Id.* at 81; *see Western Alliance Ins. Co. v. Gill*, 686 N.E.2d 997, 999 (Mass. 1997) (noting that "the terms used in the pollution exclusion, such as 'discharge,' 'dispersal,' 'release,' and 'escape,' are terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste," and that the words smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste each "brings to mind product or by-products of industrial production that may cause environmental pollution or contamination").

[62]*Alf*, 850 P.2d at 1274 (quoting *Village Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 583 (Utah Ct. App. 1990)).

[63]*Id.* at 1275.

[64]*LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988).

> A.  The following exclusion is added to paragraph 2., Exclusion of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (SECTION 1 – COVERAGES):
> This insurance does not apply to "bodily injury" or "property damage" arising from "your work" performed by others on your behalf.[65]

"Your work" is defined in the Policy as meaning, among other things, "[w]ork or operations performed by you or on your behalf."[66]

UNIC, who acknowledges that IPE was not directly involved in the activity that led to the Accident, does not argue that this endorsement precludes coverage because of work or operations performed by IPE.[67]  Instead, UNIC argues that IPE's claim is precluded under this endorsement because the work that gave rise to the Accident was being done on IPE's "behalf." UNIC claims that because the work performed by Noble, BLSR, and T & L was "*intended* to benefit all parties to the Roberts and C.J. Waller operating agreements, including IPE," such

---

[65](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00323.)  The exclusion goes on to provide:

> However, this subparagraph does not apply if:
>  1.  the "bodily injury" or "property damage" arises from "your work" performed by your "employee" or "executive officer"; or
>  2.  the "bodily injury" or "property damage" arises from your work performed by others who have, in force at the time of such "occurrence", insurance of the types provided by this policy and the limits of liability for such insurance are equal to or greater than the limits of insurance provided by this policy; and such others have held you harmless under contract as respects liability arising from their negligence.

(*Id.*)

[66](*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00313.)

[67](*See id.* at 24 ("Three parties were involved in the Rosharon explosion – Noble, the producer of the waste; T & L, the company hired by Noble to transport and dispose of the waste; and BLSR, the disposal site.").)  Not only was IPE not involved in the Accident, but UNIC has made no indication that IPE had any responsibility to arrange for or oversee the disposal of the waste from the Wells.  UNIC does not dispute that Noble was responsible for the day-to-day operations of the Wells and acknowledges that "the unloading of waste at the BLSR disposal facility was work set in motion by Noble, the operator of the wells pursuant to the [Joint Operating Agreement]."  (UNIC's Reply, at 16; *see also* UNIC's Memo. In Support, at 24 (arguing that the "transporting, unloading and disposing [of] the waste" was "set in motion by Noble, as operator of the operating agreements").)

work was done on IPE's "behalf."[68]   Therefore, UNIC claims, the endorsement "operates to bar

coverage for any claims related to the Rosharon explosion."[69]   According to UNIC, not only was

the transporting of waste from the Wells done on IPE's behalf, but "in fact, whatever actions

Noble took as an operator were done on behalf of IPE and all other parties to the operating

agreements, because they all owned a percentage of the working interest in the wells."[70]

Under UNIC's broad interpretation, IPE is intended to benefit from the operation of the

Wells, and therefore any activity done in connection with the operation of the Wells, whether

done by one of the Wells' owners or a third-party, constitutes "work" done on IPE's "behalf."  In

other words, any work, done by any party, that benefits or is merely intended to benefit an

insured constitutes "work or operations . . . performed on [the insured's] behalf."[71]   Under this

broad interpretation of the endorsement, it is hard to imagine many, if any, instances in which

this endorsement would not apply to bar coverage under the Policy.

UNIC has not met its burden of showing that the endorsement was intended to have such

a sweeping application.  That the phrase "on your behalf" was so broad as to include any work

---

[68](UNIC's Memo. In Support, at 25 (emphasis added); *see id.* at 24 ("It is undisputed that in transporting, unloading, and disposing of the waste, [Noble, T & L, and BLSR] were performing operations that were on IPE's 'behalf.'"); *id.* ("[T]he work performed by Noble, BLSR, and T & L was done to benefit IPE's ownership interest in the C.J. Waller and Roberts wells."); Tr. 12/20/06, at 20-21 ("The witnesses that we deposed in this case all admitted that when the employees were going to the waste disposal facility to unload the waste from the wells, they were doing it at the benefit of IPE.  They were doing it for the benefit of the investors and the owners and nonoperators of the two wells.  It was being don on IPE's behalf.") (Ms. Blanch).)

[69](UNIC's Memo. In Support, at 25.)

[70](*Id.* at 6.)

[71]Given that the work done with respect to the disposal of the waste – the work allegedly done on IPE's behalf – resulted in the Accident, it is a stretch for UNIC to suggest that such work was a benefit to IPE or to the "owners and nonoperators" of the Wells.  As a result of such work, and the resulting bodily injury and death that was caused by the Accident, IPE paid approximately $1.4 million and the parties to the operating agreements paid a combined total of more than $10 million.  Thus, UNIC is forced to argue that under the exclusion, work that is merely "intended" to benefit the insured constitutes work done on the insured's "behalf."

27

that benefits or is merely intended to benefit the insured was not "clearly and unmistakably communicate[d]" by UNIC in drafting the endorsement.  Instead, considering the language of the endorsement as a whole, a reasonable interpretation of the exclusion is that it was intended to apply to circumstances where an insured was obligated to perform certain work but arranged for a third-party to do such work on its behalf.

In this case, there is no dispute that IPE was not responsible for the day-to-day operations of the Wells, had no obligation to arrange for or oversee the disposal of the waste from the Wells, and was not involved in the disposal of the waste at the time of the Accident.  Under these facts, the court determines that UNIC has not met its burden of showing that the endorsement applies to IPE's claim.

### d.       Damages Claimed by a Co-owner Exclusion

Finally, UNIC argues that IPE's claim is barred by the following language of the "Underground Resources Coverage" endorsement:

> B.  The following exclusions are added to COVERAGE A – BODILY INJURY
> AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):
> This insurance does not apply to:
> . . . .
>     b.  Damages claimed by any "co-owner of the working interest[.]"[72]

According to UNIC, "[i]t is undisputed that Noble is IPE's 'co-owner of the working interest' in the C.J. Waller and Roberts oil wells, and that IPE's claims are for damages sought by Noble. IPE's claims are therefore excluded under the plain language of this endorsement."[73]

IPE does not dispute that Noble is a co-owner of the Wells, but argues that the exclusion

---

[72](UNIC's Memo. In Support, Ex. A1 (UNIC CGL Policy), at UNG-00329.)

[73](*Id.* at 18.)

28

does not apply in this case because it paid the approximately $1.4 million because of damages claimed by or on behalf of the victims who suffered bodily injury and death as a result of the Accident, not because of bodily injury or property damages claimed by Noble.

The Underground Resources Coverage endorsement specifically provides that the "[d]amages claimed by any 'co-owner of the working interest'" exclusion was "added to COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages)."[74]  In light of this provision, the court determines that the "[d]amages claimed by any 'co-owner of the working interest'" referred to in the endorsement plainly means damages claimed by a co-owner for bodily injury or property damage suffered by that co-owner.

After the Accident, and based upon IPE's ownership interest in the Wells, IPE paid over $1.4 million in damages because of bodily injury.  Those damages were not claimed by Noble on its own behalf, but were claimed by or on behalf of the individuals who were killed or injured in the Accident.  None of the individuals who died or were injured as a result of the Accident were Noble employees, and there has been no allegation that any portion of the $1.4 million that IPE paid was for property damage suffered by Noble.  That Noble initially paid the settlement amount and then invoiced IPE for its proportionate share does not change the fact that the damages for bodily injury were claimed by the victims of the Accident, not Noble.  Accordingly, the court determines that UNIC has not shown that the "[d]amages claimed by any 'co-owner'" exclusion of the Underground Resources Coverage endorsement applies to IPE's claim.

### 3.    The UNIC Excess Policy

UNIC also claims that coverage under the UNIC Excess Policy is not triggered because

---

[74](*Id.*, Ex. A1 (UNIC CGL Policy), at UNG-00329.)

the UNIC CGL Policy does not provide coverage for IPE's claim and because of certain exclusions included in the Excess Policy.

The UNIC Excess Policy provides that UNIC "will pay those sums in excess of the applicable limits of [the UNIC CGL Policy] that the insured becomes legally obligated to pay as damages because of an occurrence or offense or that event covered by [the UNIC CGL Policy.]"[75]  As discussed above, IPE's indemnification claim is covered under the terms of the UNIC CGL Policy, which has a single occurrence limit of $1 million.  Because IPE's claim for approximately $1.4 million is in excess of the applicable limits of the UNIC CGL Policy, coverage under the UNIC Excess Policy will be triggered unless one of the exclusions relied on by UNIC precludes coverage.

First, UNIC argues that the Excess Policy does not apply because of the following provision in the "Oil Industry Limitation" endorsement: "This insurance does not apply to injury or damage: . . . 5. Claimed by any co-owner of the working interest."[76]  As discussed above with respect to the Underground Resources Coverage endorsement, IPE did not pay $1.4 million because of "injury or damage" claimed by Noble itself.  Instead, this amount was paid because of bodily injury and death suffered by the victims of the Accident.  Noble funded the settlement and then invoiced IPE for its proportionate share, which IPE agreed to pay under the terms of the operating agreements.  The fact that IPE's payment was made to reimburse Noble instead of being paid directly to the victims of the Accident does not mean that IPE's payment was for "injury or damage" claimed by Noble.

---

[75](*Id.*, Ex. A2 (UNIC Excess Policy), at UNG-00241.)

[76](*Id.*, Ex. A2 (UNIC Excess Policy), at UNG-00271.)

Next, UNIC argues that like "the similar contractual [liability] exclusion" in the UNIC CGL Policy, the UNIC Excess Policy precludes "coverage for any liability assumed in a contract."[77]  In support of its position, UNIC relies on the portion of the Oil Industry Limitation endorsement that provides:

> B.  Except insofar as coverage is available to the insured in valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, for the full limit shown, and then only for such liability for which coverage is afforded under the "underlying insurance," this insurance does not apply to:
> . . .
>   5.  Liability assumed by the insured under any contract or agreement.[78]

UNIC also relies on the following language from the "Contractor's Limitation" endorsement:

> III.  Except insofar as coverage is available to the Insured in valid and collectible "underlying insurance" as listed in the Declarations, and then only for such liability for which coverage is afforded under the "underlying insurance", for the full limit shown, this insurance does not apply to:
>   A.  Any liability assumed by an insured under any contract or agreement.[79]

IPE argues that the these exclusions do not apply to IPE's claim for the same reason that the contractual liability exclusion of the UNIC CGL Policy did not apply to IPE's claim.  IPE also argues that the exclusions do not apply because the "[e]xcept insofar as coverage is available to the insured in valid and collectible 'underlying insurance'" phrase in the endorsements clearly means that "where there is coverage under the [UNIC CGL] Policy, there is excess coverage under the Excess Policy."[80]  UNIC did not respond to IPE's arguments.[81]

---

[77](*Id.* at 27.)

[78](*Id.*, Ex. A2 (UNIC Excess Policy), at UNG-00272.)

[79](*Id.*, Ex. A2 (UNIC Excess Policy), at UNG-00268.)

[80](IPE's Opposition Memo., at 31.)

[81]With respect to the issue of whether IPE's claim is covered under the UNIC Excess Policy, both UNIC
(continued...)

31

The court agrees with IPE.  Under the plain language of the Oil Industry Limitation and Contractor's Limitation endorsements, the exclusions do not apply if coverage is available to IPE under the UNIC CGL Policy.  As discussed in detail above, the UNIC CGL Policy provides coverage for IPE's claim.  In addition, these exclusions do not apply to IPE's claim for the same reasons discussed above with respect to the UNIC CGL Policy's contractual liability exclusion.

Finally, UNIC claims that IPE's claim is not covered under the Excess Policy's pollution exclusion, which is "identical" to the UNIC CGL Policy's pollution exclusion.[82]  As discussed above, the pollution exclusion does not bar IPE's claim.

Because none of these exclusions of the UNIC Excess Policy apply to or bar IPE's claim, IPE is entitled to coverage under the Excess Policy for the portion of its claim that is in excess of the applicable limits of the UNIC CGL Policy.

**B.    UNIC's and St. Paul's Cross-Motions for Summary Judgment**

Having determined that IPE's indemnification claim is covered by the UNIC Policies, the court will now consider the cross-motions for summary judgment between UNIC and St. Paul.

The main question at issue in UNIC's and St. Paul's cross-motions is whether IPE was an additional insured of the St. Paul Umbrella Policy issued to Noble.  While St. Paul denies that IPE is an insured of the Umbrella Policy, UNIC disagrees and claims that the Umbrella Policy provides coverage for IPE.  UNIC further argues that the St. Paul Policies provide "primary" coverage and that the St. Paul Umbrella Policy should be applied to IPE's indemnification claim before either of the UNIC Policies are applied.  According to UNIC, if the St. Paul Umbrella

---

[81](...continued)
and IPE provided minimal briefing and neither party raised the issue during oral argument.

[82](UNIC's Memo. In Support, at 27.)

Policy is applied to IPE's claim, the UNIC Polices need not be applied because the coverage provided by the Umbrella Policy will "take care of IPE's claimed losses."[83]

If the court determines that IPE was not an insured of the St. Paul Umbrella Policy, UNIC also asks the court to determine whether, under the terms of the St. Paul CGL Policy, St. Paul should have contributed $2 million toward the settlement of the lawsuits related to the Accident instead of the $1 million that it provided.

As a preliminary matter, UNIC and St. Paul disagree as to whether the court should apply Utah or Texas law in interpreting the terms of the St. Paul Policies.  Both parties agree that the "most significant relationship" test set forth in *American Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186 (Utah 1996), should be applied to determine what law applies.  In that case, the Utah Supreme Court provided that in the absence of an effective choice of law by the parties, the following contacts should be taken into account in determining the law applicable to an issue: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.[84]

The court agrees with St. Paul that Texas law governs the interpretation of the St. Paul Policies.  UNIC does not dispute that the St. Paul Policies were negotiated in Texas, were issued in Texas to Noble, a Texas resident, and were issued for the purpose of insuring oil operations in Texas.  The Accident and subsequent litigation triggering the claim for coverage also occurred in Texas.  In addition, as discussed in more detail below, IPE's right to coverage under the St. Paul

---

[83](UNIC's Memo. In Support re: St. Paul at 9.)

[84]*American Nat'l Fire Ins.*, 927 P.2d at 188 (quoting the Restatement (Second) Conflict of Laws § 188 (1971)).

CGL Policy, and accordingly, UNIC's claim that IPE is an insured of the St. Paul Umbrella Policy, arise by virtue of the operating agreements entered into between Noble and IPE.  As St. Paul points out, "[t]he operating agreements relate to IPE's joint operating interest in oil and gas drilling operations in Texas not Utah."[85]

UNIC argues that because the cross-motions involve the question of whether IPE, not Noble, is an insured of the St. Paul Policies, IPE's Utah residence is the most "qualitative" factor in determining what law to apply because that would best honor IPE's expectations.[86]  However, IPE is not asserting a claim in this case for coverage under the St. Paul Policies.  Instead, it is UNIC that is claiming that in light of the St. Paul Policies, it is not obligated to provide coverage for its insured, IPE.  In this case, where IPE's expectations of coverage under the St. Paul Policies is not before the court, the court is not persuaded that IPE's Utah residence outweighs the significant contacts that the St. Paul Policies have with Texas.

The court determines that under the facts of this case, Texas has the most significant relationship with the St. Paul Policies and that Texas law should be applied to the interpretation of such policies.

---

[85](St. Paul's Memo. In Support, at 12.)

[86](UNIC's Memo. In Support re: St. Paul, at 9; UNIC's Reply re: St. Paul, at 6-7; Tr. 12/20/06, at 86:8-10 (Ms. Blanch).)

1.        **The St. Paul Umbrella Policy**

The court will now consider whether IPE is an insured of the St. Paul Umbrella Policy.  It is undisputed that IPE was an insured of the St. Paul CGL Policy.  Pursuant to the operating agreements, Noble, as the operator of the Wells, was required to obtain commercial general liability insurance for the benefit of the joint account.  Specifically, the operating agreement for the Robert Well provided:

> The Operator, during the term of this Agreement, shall carry insurance for the benefit and at the expense of the parties hereto as follows unless notified in writing by Non-Operator(s):
> . . . .
> D.     _Commercial General Liability_ Insurance covering both Bodily Injury and Property Damage with a Combined Single Limit of not less than $1,000,000 each occurrence.
> . . . .
> The Operator shall charge the joint account for insurance premiums, losses (including applicable deductibles) not covered by such insurance shall be charged to the joint account.[87]

The operating agreement for the C.J. Waller Well similarly provided:

> 1.  At all times during the conduct of operations hereunder, Operator shall maintain in force the following minimum limits of Insurance, at the expense of, and for the benefit of the Joint Account:
> . . . .
>    c) Commercial General Liability insurance with a combined single limit of $1,000,000 per occurrence.
> 2.  No other insurance shall be carried by Operator for the benefit of the Joint Account; however, the Operator and each Non-Operator shall provide and maintain in force at their own expense such other insurance or elect to be self insured as it deems necessary for protection against any claims, losses, damage or destruction arising out of operations of the joint property . . . .[88]

At the time of the Accident, Noble was a named insured of the St. Paul CGL Policy.

---

[87](St. Paul's Memo. In Support, Ex. 1 (Model Form Operating Agreement for Robert Well), at IP - 0094 (Exhibit "D" – Insurance Exhibit) (emphasis in original).)

[88](_Id._, Ex. 2 (Model Form Operating Agreement for C.J. Waller Well), at IP - 0044 (Exhibit "D").)

That Policy provided:

> 1.  The following is added to the Who is Protected Under This Agreement
> section.  This change adds certain protected persons and limits their protection.
> **Oil or gas lease nonoperating working interest.**  Your oil or gas lease
> nonoperator is a protected person. . . . .
> *Your oil or gas lease nonoperator* means any owner, co-owner, co-venturer,
> mining partner, or limited liability company that has a nonoperating working
> interest in any oil or gas lease you operate.[89]

Both UNIC and St. Paul agree that in light of this language, IPE was a "protected person" – in

other words, an additional insured – of the St. Paul CGL Policy.

UNIC and St. Paul, however, dispute whether IPE was also an additional insured of the

St. Paul Umbrella Policy.  Noble Energy, Inc. was the only named insured of the St. Paul

Umbrella Policy.[90]  And while the Umbrella Policy expressly enumerated a number of other

entities as additional insureds, IPE was not one of them.[91]  Thus, the question for the court to

decide is whether the St. Paul Umbrella Policy provides coverage for IPE based on the following

policy language:

> **Other protected persons for injury or damage under your
> Basic Insurance.**  Any other person or organization who is a
> protected person under your Basic Insurance is also a protected
> person for injury or damage under this agreement.  But their
> protection is also subject to any coverage limitation in your Basic
> Insurance.
> If such persons or organizations are included as protected persons
> under your Basic Insurance because:

---

[89](*Id.*, Ex. 4 (St. Paul CGL Policy), at Additional Protected Persons Endorsement – Oil or Gas Lease
Nonoperating Working Interest – Oil and Gas Commercial General Liability.)

[90](*Id.*, Ex. 7 (St. Paul Umbrella Policy), at Policy Change Endorsement.)  On the cover page of the
Umbrella Policy, Noble Affiliates, Inc. was named as the insured.  ( *Id.*, Ex. 7 (St. Paul Umbrella Policy), at Form
No. 101, 1/01.)  However, a Policy Change Endorsement indicates that "Effective at inception, Noble Affiliates, Inc.
has been deleted and the following has been added as the first named insured: Noble Energy, Inc. - Corporation."
(*Id.*, Ex. 7 (St. Paul Umbrella Policy), at Policy Change Endorsement.)

[91](*Id.*, Ex. 7 (St. Paul Umbrella Policy), at Additional Named Insureds Endorsement.)

> - a written contract with you has been made before the bodily injury or property damage happens or before the offense is committed; and
> - that contract requires you to provide liability insurance on behalf of that person or organization;
>
> we will consider them to be protected persons for injury or damage under this agreement.  *But only to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage, subject to the limits of coverage for this agreement.*[92]

The Umbrella Policy identifies the St. Paul CGL Policy as the "Basic Insurance."[93]

UNIC and St. Paul dispute how the "[b]ut only to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage" language of the Umbrella Policy impacts IPE's status as an additional insured.  According to St. Paul, "[a]lthough the umbrella policy extends coverage to persons protected under Noble's primary insurance policy pursuant to written contract with Noble, the umbrella policy provides such coverage *only if* the written contract requires coverage limits that exceed those provided by the basic insurance policy."[94]  St. Paul argues that because the St. Paul CGL Policy provided the coverage limits required by the operating agreements, "the umbrella policy language does not extend coverage to IPE."[95]

UNIC agrees that the Umbrella Policy's language limits the policy's application where a person or organization is included as a protected person under the St. Paul CGL Policy because of a written contract with the insured.  However, UNIC argues that IPE's status as an insured of

---

[92](*Id.*, Ex. 7 (St. Paul Umbrella Policy), at Oil and Gas Umbrella Excess Liability Protection, page 10 of 24 (italic emphasis added).)

[93](*Id.*, Ex. 7 (St. Paul Umbrella Policy), at Oil and Gas Umbrella Liability Protection Schedule of Basic Insurance.)

[94](*Id.* at 13 (emphasis in original).)

[95](*Id.*)

the St. Paul CGL Policy does not stem from the operating agreements, but instead is based on "*the endorsement in the underlying policy naming all of Noble's nonoperators as 'protected persons.'*"[96]  UNIC claims that "IPE would be a 'protected person' regardless of Noble's insurance commitments under the operating agreements."[97]  Thus, according to UNIC, the limiting language in the Umbrella Policy does not apply to IPE and "IPE is an insured to the full extent of coverage available under the St. Paul policies under principles of liberal insurance policy construction."[98]

UNIC provides no support for its claim that IPE is a nonoperator of the Wells separate and apart from the operating agreements.  Based on the facts that the parties have presented to the court, the relationship between Noble and IPE, and accordingly IPE's status as a nonoperator, arise from the operating agreements.  In the absence of the operating agreements, the court has no basis upon which to determine that there would be any relationship between Noble and IPE or that IPE would still maintain its status as a nonoperator of the Wells.  Thus, the court determines that IPE is an organization that was included as a protected person under the St. Paul CGL Policy because of the operating agreements – written contracts that required Noble to provide liability insurance on behalf of IPE.  The limiting language in the St. Paul Umbrella Policy, therefore, applies to IPE.

Both the plain language of the St. Paul Umbrella Policy and Texas law support Noble's position that the Umbrella Policy does not extend coverage to IPE.  The operating agreements

---

[96](UNIC's Reply re: St. Paul, at 10 (emphasis in original).)

[97](*Id.* at 11.)

[98](*Id.*)

for both the Robert Well and the C.J. Waller Well required that Noble obtain commercial general liability insurance with a limit of not less than $1 million per occurrence.  UNIC does not contend that the St. Paul CGL Policy, which had a general total limit of $2 million and a $1 million coverage limit for "each event," failed to satisfy Noble's insurance requirements under the operating agreements.  In addition, UNIC has not pointed to any language in the operating agreements that establishes that Noble had any obligation to obtain any insurance coverage for IPE over and above the $1 million limit.  In fact, to the contrary, the operating agreement for the C.J. Waller Well specifically provided that besides providing commercial general liability insurance with a combined single limit of $1 million per occurrence, "[n]o other insurance shall be carried by Operator for the benefit of the Joint Account" and that "the Operator and each Non-Operator shall provide and maintain in force at their own expense such other insurance or elect to be self insured as it deems necessary for protection against any claims, losses, damage or destruction arising out of operations of the joint property . . . ."[99]

In this case, the limits of coverage required by the operating agreements do not exceed the policy limits of the St. Paul CGL Policy.  There is no gap between the amount of liability insurance that Noble was required to obtain under the operating agreements and the amount of liability insurance that Noble actually obtained through the St. Paul CGL Policy.  Thus, under the plain language of the St. Paul Umbrella Policy, coverage under such Policy is not extended to IPE.

*Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039 (5th Cir. 1991), a factually similar case relied on by both UNIC and St. Paul, supports the court's conclusion.  In that case, Forest

---

[99](St. Paul's Memo. In Support, Ex. 2 (Model Form Operating Agreement for C.J. Waller Well), at IP - 0044 (Exhibit "D").)

Oil Corp. ("Forest") and Strata Energy, Inc. ("Strata") entered into an agreement to develop certain oil and gas properties in Texas.[100]  The agreement provided that Forest, as the operator, was required to obtain insurance for the benefit of both parties.[101]  Specifically, Forest was to procure general public liability insurance "with limits of not less than" $100,000 for injury of one person and $300,000 for injury of two or more persons involved in one accident.[102]  Before entering into its agreement with Strata, Forest had procured a $1 million primary policy issued by American Home Assurance Company ("American") and a $1 million excess policy issued by Southern Marine and Aviation Underwriters, Inc. ("Southern").[103]

After Forest and Strata entered into their agreement, a fire at one of their wells caused injury to several individuals.[104]  The injured individuals then brought a personal injury lawsuit against Forest, but not Strata.[105]  Forest and its insurers ultimately settled the claims.[106]  Forest then brought a suit against Strata, seeking damages for Strata's proportionate share of the cost of the settlement.[107]  The district court entered judgment in favor of Forest, finding that Strata was responsible for its share of the settlement in excess of the stated insurance requirement of

---

[100]*Forest Oil*, 929 F.2d at 1040.

[101]*Id.* at 1040-41.

[102]*Id.* at 1041.

[103]*Id.*

[104]*Id.*

[105]*Id.*

[106]*Id.* at 1041-42.

[107]*Id.* at 1042.

$300,000 for the injury of more than one person.[108]  On appeal, Strata argued that it was entitled

to the full benefits of the American and Southern policies even though this coverage was

substantially in excess of the amount of coverage Forest was required to procure under their

agreement.[109]

The Court of Appeals, applying Texas law, determined that with respect to the primary

American policy,

> This policy stated that it would apply to non-operators, such as Strata, "for whom
> the Named Insured [Forest] has agreed in writing to provide insurance in connection
> with such operations solely done by the Named Insured."  The policy did not state
> that it would cover non-operators only to the extent that Forest was contractually
> required to provide such insurance.  Thus, it is clear that Strata was an additional
> insured under the American policy to the full extent of its one million dollar primary
> coverage.[110]

But, the court came to a different conclusion with respect to Strata's entitlement to coverage

under the Southern excess policy.  While the Southern policy provided that it applied to "any

organization . . . to whom the Named Assured [Forest] is obligated by virtue of a written contract

or agreement to provide insurance such as is afforded by this policy," it also provided, like the

St. Paul Umbrella Policy, that such organizations were covered "'but only to the extent of such

[contractual] obligation.'"[111]  The court determined that based on this limiting language,

> Forest clearly was not obligated under the agreement to provide such excess
> insurance.  It was only required to provide insurance with not less than
> $100,000/$300,000 primary coverage (and the American primary policy wholly
> fulfilled any such obligation).  Thus, Strata was not an insured under the Southern

---

[108]*Id.*

[109]*Id.* at 1043.

[110]*Id.* at 1044.

[111]*Id.* at 1045.

excess policy and, therefore, was not entitled to the benefits of that policy.[112]

Similarly, Noble was not contractually obligated to procure insurance coverage for IPE over and above that provided by the St. Paul CGL Policy. The $1 million-per-event coverage limit of the St. Paul CGL Policy fulfilled Noble's obligation. Accordingly, IPE is not an insured of the St. Paul Umbrella Policy.

UNIC argues that even if the court determines that the "[b]ut only to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage" language precludes IPE's coverage under the St. Paul Umbrella Policy, that language should not be applied to IPE because "St. Paul never bothered to give IPE a copy of the St. Paul umbrella policy or its exclusionary language."[113]   UNIC claims that under Utah law, "language purporting to limit or exclude coverage to an insured is invalid if the insured has not received a copy of the language prior to the loss to which it is applied."[114]

In the court's opinion, the fact that IPE did not receive a copy of the St. Paul Umbrella Policy is of no consequence in this case. First, Texas, not Utah, law applies to this issue.[115]   In

---

[112]*Id.*

[113](Tr. 12/20/06, at 83:22-23 (Ms. Blanch).)

[114](UNIC's Reply re: St. Paul, at 12.)

[115]Even if Utah law did apply, the facts of the Utah cases that UNIC relies on in support of its position are materially different from the facts of this case. The cases cited by UNIC involve circumstances where an individual, who is undisputedly an insured of the policy at issue, was unaware of the exclusionary language relied on by the insurer to preclude coverage of the insured's claim. ( *See* UNIC's Memo. In Support re: St. Paul, at 22-23 (citing *Farmers Ins. Exch. v. Call*, 712 P.2d 231 (Utah 1985); *General Motors Acceptance Corp. v. Martinez*, 668 P.2d 498 (Utah 1983); *Moore v. Energy Mut. Ins. Co.*, 814 P.2d 1141 (Utah Ct. App. 1991)).) In this case, the question of whether IPE is an insured of the St. Paul Umbrella Policy is clearly in dispute. And importantly, IPE, the potential insured, is not claiming that it is entitled to coverage under the St. Paul Umbrella Policy. Thus, while the Utah cases cited by UNIC indicated that disclosure of exclusionary language is required in order to honor the insured's reasonable expectations of coverage, in this case, IPE's expectation of coverage is not at issue. Instead, what is at issue is UNIC's claim that its insurance obligation to IPE is impacted by the existence of the St. Paul Policies.

addition, the "[b]ut only to the extent that the limits of coverage required by the contract exceed your Basic Insurance limits of coverage" phrase at issue is not exclusionary language, as UNIC suggests. Its purpose is not to take away or exclude certain coverage of a person or organization that has already been deemed an insured. Instead, this language, which is found in the "Who Is Protected Under This Agreement" section of the Umbrella Policy, is an insuring provision that establishes who is entitled to coverage in the first place. Because the language of the Umbrella Policy does not include IPE as an insured, as discussed above, St. Paul had no obligation to provide IPE with a copy of the Umbrella Policy or the exclusionary language contained therein.

### 2.    The St. Paul CGL Policy

St. Paul previously paid $1 million under the St. Paul CGL Policy toward the settlement of the lawsuits related to the Accident. This amount was applied so that it benefitted Noble, IPE, and Aspect based on their proportionate ownership interests in the Wells. UNIC now argues that under the terms of the St. Paul CGL Policy, St. Paul should have contributed an additional $1 million toward the settlement. The court disagrees, and concludes that St. Paul met its coverage obligation under the St. Paul CGL Policy when it paid the $1 million.

While the St. Paul CGL Policy has a total coverage limit of $2 million, the Policy limits coverage for "[e]ach event" to $1 million.[116] "Event" is defined in the Policy as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[117] According to UNIC, the St. Paul CGL Policy "defines 'event' the same way most

---

[116](St. Paul's Memo. In Support, Ex. 4 (St. Paul CGL Policy), at Oil and Gas Commercial General Liability Protection Coverage Summary, page 1 of 2.)

[117](*Id.*, Ex. 4 (St. Paul CGL Policy), at Oil and Gas Commercial General Liability Protection, page 2 of 27.)

insurance policies define 'occurrence.'"[118]  Under Texas law, "'the proper focus in interpreting "occurrence," is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects.'"[119]  In other words, a "cause" analysis is applied to determine whether a set of facts involves one or more than one occurrence or event.  "This 'cause' approach . . . is utilized by the great majority of courts and jurisdictions nationwide."[120]

The parties all agree that the injuries and deaths that gave rise to Noble's and IPE's liability arose from the Accident.  Applying the "cause" analysis, it is clear that the Accident was one, single event.  This conclusion is not changed by the "'number of injurious effects'" that resulted from the Accident.[121]  Because there was only one event, St. Paul properly paid the CGL Policy's $1 million coverage limit and had no obligation to provide any additional coverage.

UNIC argues that the Accident "had multiple 'causes' because the waste that ultimately led to the underlying litigation came from both the C.J. Waller and Roberts Wells."[122]  As previously discussed, neither UNIC, nor any other party to this matter, have proffered any specific evidence regarding what exactly caused the Accident.   In its memorandum in support of its cross-motion for summary judgment against IPE, UNIC stated generally that the Accident occurred during "the process of unloading hazardous waste material that had been transported

---

[118](UNIC's Reply re: St. Paul, at 13.)

[119]*Ran-Nan Inc. v. General Accident Ins. Co. of Am.*, 252 F.3d 738, 740 (5th Cir. 2001) (quoting *H.E. Butt Grocery Co. v. National Union Fire Ins. Co.*, 150 F.3d 526, 530 (5th Cir. 1998) (applying Texas law)).

[120]*Ran-Nan*, 252 F.3d at 740 (citing *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F. Supp. 1325, 1330 (N.D. Tex. 1980)).

[121]*See Ran-Nan*, 252 F.3d at 740 (quoting *H.E. Butt Grocery Co.*, 150 F.3d at 530).

[122](UNIC's Reply re: St. Paul, at 13; *see* UNIC's Memo. In Support re: St. Paul, at 24 (arguing that St. Paul should have paid an additional million dollars under the St. Paul CGL Policy "because Noble and IPE entered two separate operating agreements covering two separate wells, and the waste that ultimately led to the underlying litigation came from both wells").)

from *one or both* of the wells."[123]  Moreover, UNIC's position that the Accident involved waste from both of the Wells contradicts its own statement that "[n]o distinction was ever made as to what well produced the waste that caused the vapor cloud ignition."[124]  However, even if it was definitively established that waste from both of the Wells contributed to the Accident, the pertinent question is not whether the Accident had multiple causes, but instead, what caused the injuries that gave rise to the insured's liability.  In this case, it is clear that one event – the Accident – gave rise to Noble's and IPE's liability.  Under these circumstances, the St. Paul CGL Policy's coverage limit was $1 million.

The court has determined that IPE is not an insured of the St. Paul Umbrella Policy and that St. Paul met its coverage obligation under the St. Paul CGL Policy by paying $1 million toward the settlement of the claims brought in relation to the Accident.  Because IPE is not entitled to any additional benefits under the St. Paul Policies, the court need not determine whether the St. Paul Policies provide "primary" coverage when compared to the UNIC Policies.

For the reasons set forth above,

**IT IS ORDERED** that IPE's Cross-Motion for Summary Judgment (dkt. no. 78) is GRANTED, and Plaintiff's Motion for Summary Judgment on All Claims Against, and on All Counterclaims of, Defendant International Petroleum & Exploration (dkt. no. 51) is DENIED.  Accordingly, IPE is entitled to $1,422,375 plus post-judgment interest at the applicable rate.  The court will consider the questions of pre-judgment interest and attorney's fees only upon an appropriate application;

---

[123](UNIC's Memo. In Support, at 5 (emphasis added).)

[124](UNIC's Reply re: St. Paul, at 13.)

45

**IT IS FURTHER ORDERED** that Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 86) is GRANTED, and Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company (dkt. no. 82) is DENIED; and

**IT IS FURTHER ORDERED** that because the court has determined that UNIC is obligated to provide coverage for IPE's indemnification claim, IPE's counterclaim for reformation of contract and IPE's third-party claims, all of which IPE asserted only to the extent that UNIC prevailed on its claims against IPE, are hereby DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED this _____ day of December, 2007.

BY THE COURT:

_____
Bruce S. Jenkins
United States Senior District Judge

**IT IS FURTHER ORDERED** that Defendant St. Paul Surplus Lines Insurance Company's Motion for Summary Judgment (dkt. no. 86) is GRANTED, and Plaintiff's Motion for Summary Judgment on All Claims Against St. Paul Surplus Lines Insurance Company (dkt. no. 82) is DENIED; and

**IT IS FURTHER ORDERED** that because the court has determined that UNIC is obligated to provide coverage for IPE's indemnification claim, IPE's counterclaim for reformation of contract and IPE's third-party claims, all of which IPE asserted only to the extent that UNIC prevailed on its claims against IPE, are hereby DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED this 20th day of December, 2007.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

46